**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**EBONI T. ROBINSON**

Plaintiff,

vs.

Hon.
Mag Judge:
Case No.: 26-

**THE LINCOLN NATIONAL LIFE INSURANCE COMPANY**,
an Indiana corporation,

Defendant.
_______________________________________________/

**COMPLAINT**

Plaintiff, EBONI T. ROBINSON, through her attorneys, ILANA S. WILENKIN and FELDHEIM & WILENKIN, P.C., complains against the above-named Defendant as follows:

## I. Jurisdiction and Venue

1) This Court's jurisdiction exists under the Employee Retirement Income Security Act of 1974 ("ERISA"), specifically, 29 U.S.C. §§ 1132(e)(1) and 1132(f), which provisions grant this Court the jurisdiction to hear civil actions to recover benefits due under the terms of an employee welfare benefit plan.

2) Plaintiff, Eboni T. Robinson ("Mrs. Robinson"), worked for DTE Energy, which sponsors and administers the DTE Energy Health and Welfare Benefit Plan (the "Plan/Policy") for the benefit of its employees/former employees, including Mrs. Robinson.

3) Defendant, The Lincoln National Life Insurance Company ("LF") administers long-term disability ("LTD") and, upon information and belief, total disability life premium waiver claims for the Plan. It also underwrites said coverages.

4) 29 U.S.C. § 1133 provides a mechanism for the administrative or internal appeal of benefit denials. Mrs. Robinson has either exhausted all her appeals or has been denied access to a meaningful and/or full and fair pre-suit appellate review. This matter is ripe for juridical review.

5) Pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391, venue is proper in the Eastern District of Michigan.

## II. Nature of Action

6) This is a claim seeking LTD benefits and a total disability waiver of life insurance premium. The claim(s) is being brought pursuant to § 502(a)(1)(B) of ERISA - 29 U.S.C. § 1132(a)(1)(B).

## III. The Parties

7) Mrs. Robinson is 42 years old. She was, and continues to remain, a resident of Detroit, Michigan.

8) LF is an Indiana corporation conducting insurance-related business in Michigan, including the Eastern District. Its Resident Agent for service of process is CSC-Lawyers Incorporating Service (Company) 3410 Belle Chase Way, Suite 600, Lansing, MI 48911.

9) During all relevant times, the Plan constituted an "employee welfare benefit plan," as defined by 29 U.S.C. § 1002(1), and, incidental to her employment with DTE Energy, Mrs. Robinson received coverage under the Plan as a "participant," as defined by 29 U.S.C. § 1002(7). This claim relates to benefits due under the above-described Plan.

## IV. Factual Statement & Medical Support

10) Mrs. Robinson began working for DTE Energy on 2/22/16 as a Support Specialist, Planning & Design.

11) Mrs. Robinson stopped working on 10/16/18 as a result of significant physical impairments and chronic, debilitating pain caused by lupus, osteonecrosis, CRPS, and other conditions.

12) Shortly after her last day of work, Mrs. Robinson applied to LF to begin receiving LTD benefits, which LF approved and paid beginning 3/17/19 through 5/7/25. Mrs. Robinson's claim transitioned from own occupation to any occupation on 3/17/21.

13) Upon information and belief, LF approved Mrs. Robinson's total disability waiver of life premium waiver for the same time period.

14) During the 6+ years that LF paid Mrs. Robinson LTD benefits, it conducted various medical reviews as well as surveillance and social media investigations.

15) On 12/21/20, ALJ Turner (Social Security Administration ("SSA")) determined that Mrs. Robinson became disabled under the SSA's rules on 10/17/18, with benefits payable as of 4/1/19. Based on that favorable decision, LF was entitled to recover from Mrs. Robinson an approximate $22,000.00 overpayment, which she reimbursed in full.

16) Around 2024, LF initiated surveillance and conducted a general activity investigation.

17) Surveillance yielded 3 days of unrevealing video, and LF's general investigation located social media posts that addressed chronic

pain, positive thoughts and affirmations, real estate references, and minimal social activities.

18) On 3/24/25, LF enlisted Angelica Shepard, M.D. (rheumatology) to perform a records review. In relevant part, Dr. Shepard noted:

> The claimant has a history of multiple rheumatological and orthopedic conditions. She has a long history of SLE, fibromyalgia, and osteonecrosis due to prolonged steroid use. The claimant also has a history of chronic pain syndrome, hip pain, neuropathic pain of the BLE, neck pain, myalgia, and thoracic back pain. She complains of constantly worsening pain with no relief from medications. She does not use assistive devices but she ambulates with difficulty due to osteonecrosis of the bilateral lower extremities. She also experiences significant pain symptoms in her upper/mid/thoracic region. On examination, she demonstrated unassisted but mild difficulty ambulating, tender PSM bilaterally, limited ROM, painful right hip ROM, and deconditioning. The surveillance performed on 9/7 /24 revealed that the claimant was observed walking out of her residence, standing for a few minutes before walking back into her residence. There were no abnormalities in gait or guarding or difficulty with ambulation identified during this brief monitoring. She continued to complain of and demonstrate severe overwhelming pain affecting her ability to perform her ADs, affecting her mobility and movement of her lower extremities. The claimant's pain symptoms have not shown any evidence of significant improvement and thus warrant the placement of restrictions and limitations within the period of review.
>
> **Sitting: Constantly**
> **Standing: Frequently**

> **Walking: frequently**
> Lifting: Occasionally, up to 20 lbs. BUE
> Carrying: Occasionally, up to 20 lbs. BUE
> Pushing: Occasionally, up to 20 lbs. BUE
> Pulling: Occasionally, up to 20 lbs. BUE
> Climbing stairs: Occasionally
> Balancing: Frequently
> Stooping: Frequently
> Kneeling: Frequently
> Crouching: Frequently
> Crawling: Occasionally
> Reaching: Frequently overhead and below waist levels, BUE; Unrestricted to desk level, BUE
> Use lower extremities for foot controls: Frequently BLE
> Fine manipulation: Unrestricted BUE
> Simple and firm grasping: Unrestricted BUE
>
> The above-recommended restrictions and limitations are indicated from 3/1/2024 to present with reassessment on or around 09/30/2025.
>
> No, the medical records do not support the restrictions and limitations that were recommended by treating providers for the timeframes in question.
>
> The claimant's abilities are sustainable on a full-time basis. While I agree that restrictions are supported, I respectfully disagree with the recommendation that the claimant is unable to perform all activities due to chronic pain. The claimant can sustain full-time activities with appropriate restrictions.

(Claim File). (emphasis added).

19) LF sent Dr. Shepard's report to Dr. Juratli (Mrs. Robinson's primary care physician) and Dr. Stubbs (Mrs. Robinson's rheumatologist) for review and comment.

20) On 4/14/25, Dr. Juratli responded to written questions as follows:

> 2) I have supplied additional information/comments to highlight where I do not agree with the findings of the review. Patient does have depression that limits her work ability, given her advanced hip osteonecrosis I dont [sic] believe she can or should crawl, crouch, kneel or stoop. Also use of stairs should be minimal/infrequent.

(Ex. 2 of 11/18/25 Administrative Appeal).

21) On 4/24/25, Dr. Stubbs responded to LF's questions by agreeing with Dr. Shepard's recommendations. (Ex. 3 of 11/18/25 Administrative Appeal).

22) Based on Dr. Shepard's opinions, Jason M., M.Ed., CRC, ABVE/F (LF employee) conducted a Transferable Skills Analysis on 5/1/25 in which he provided a selection of sedentary occupations.

23) On 5/8/25, LF denied Mrs. Robinson's LTD and, presumably, waiver of life premium claims.

24) On 11/18/25, Mrs. Robinson appealed LF's denial, which included the following medical evidence:

25) 1/14/25 is the last treatment note that Dr. Stubbs provided to LF. On 6/11/25, Mrs. Robinson returned to Dr. Stubbs who noted:

This 41 y.o. woman has been followed by Dr. Vreede and Dr. Menerey with lupus and avascular necrosis. Her major problems have been severe overwhelming pain. She remains essentially housebound and is severely depressed. She does have a pain specialist but continues with very severe pain.

Discussed her symptoms. It appears that most of her pain issues are related to chronic pain from avascular necrosis. Reassuring way [?] she has been weaned off prednisone. She is currently taking azathioprine with Plaquenil. Patient has had great difficulty with performing ADLs due to chronic pain. She also understands that she has a component of fibromyalgia which makes her some even more severe. She spends most of her days at home. She is not able to help her husband with daily household activities.

Currently experiencing more morning stiffness. No myalgias, rash, oral ulcers or any other lupus to finding symptoms. She has chronic alopecia [and] this has not improved with treatment of lupus. She is off prednisone. She continues to have chronic back pain. No identifiable cause on imaging w/u. She is taking gabapentin, flexeril and norco for pain. She is complaining of fullness in her RLQ. She has daily stools however she has irregularity in the consistency. No pain over the umbilicus. No fever, no blood in stools.

She is also describing severe pain that is relieved with over extension/flexion of her joints. She frequently has her husband assist her with adjusting her back. She was previously a dancer and has had longstanding hyperflexibility. Was previously able to do yoga before illness.

Today she continues to have upper back pain along with burning/sharp pain sensations over her back and scapula. She has pain in her hands. We reviewed negative US previously. She has hypermobility and dysfunction with her hands. Currently on lower dose of gabapentin. Reports drowsiness

when she takes Gabapentin, Norco and Flexeril together. She avoids taking Norco however she also notices increase jitteriness recently.

**Physical Exam:**
She has evidence of hypemobility in her upper and lower extremities.

**#SLE**
She was diagnosed with lupus in 2018 with features of alopecia, arthralgias, thrombocytopenia, positive ANA and SSA, low C3 and C4. She was treated with pulse steroids, IVIG and hydroxychloroquine. She had elevated LFTs that resolved with steroids. Unfortunately her main symptoms today is related to chronic pain from osteonecrosis. US negative making SLE an unlikely cause of her ongoing joint symptoms. Inflammatory markers negative. Lupus currently in remission however she has other ongoing issues contributing to chronic pain. Quite a bit of time was spent discussing chronic pain.

-Continue Plaquenil 200 mg daily
-continue Azathioprine 50 mg daily
-consider probiotic see below
-Omega-3 supplement ordered
-also discussed mediterranean diet, see below

**#Hypermobiity syndrome**
Seen more frequently in SLE patients however does not indicate active disease. Possible sequalae of disease. Hypermobility can contribute to polyarthralgia and patient's beginning in their 20s and 30s. I suspect that this is also a contributing factor to her noninflammatory joint pain. The treatment for this is low impact exercises however she should avoid doing any activities with extensive hyper extension. A great deal of time was spent counseling the patient on this. would like to forego physical therapy for now however this is a consideration for the future to reduce the

risk of joint damage and neuropathy associated with damage to nociceptive nerve fibers.

- Newer 2017 criteria has tightened criteria for diagnosing hEDS, which is solely to create a smaller homogenous patient population from which to locate causative genes. HSD are a group of conditions related to joint hypermobility (JH) that do not meet the criteria for hEDS. Treatment for both hEDS and HSD is symptom-based they can be equal in severity, and more importantly, both need similar management, validation, and care.

- Discussed that joint hypermobility hEDS/HSD are heritable connective tissue disorders characterized by abnormal collagen synthesis. Instead of ligaments & tendons being strong, and providing support while anchoring muscles into place. There is ligamentous laxity, predisposing the joint to subluxations and dislocations. The large muscles responsible for functional movement compensate by tensing, trying to provide stabilization while also being responsible for movement. The stabilizer muscle complexes, such as the rotator cuff, spinal multifidus, and deep hip complexes, are by comparison much smaller. They are particularly likely to atrophy quickly if they are not engaged. The resulting imbalance of the musculature predisposes to altered biomechanics of joints at other body sites, muscle spasms, tears, pain, and fatigue.

- Due to laxity of ligamentous, the musculature increases its tone esp in upper, lower back, hips etc, in an attempt try provide stability, resulting in muscles being in a constant hypertonic state.

- Because in the hypertonic state the muscles don't relax, they are not able to use the muscle pumping mechanism to move waste products out of and nutrition into the muscle cells resulting in muscle pain, aching and soreness from

accumulation of waste products or this lack of nutrition to the muscle cells.

- Can result in relative weakness as it is already being held in a constant contraction just to stabilize a joint & will not be available to contract much further to generate strength when needed.

- increased muscle tone is often not balanced around the joint; the imbalance can result in increased risk of subluxation or in injury as a result of focused compression and poor joint loading.

- the constant work being done by the muscles to maintain this hypertonicity results in fatigue & patients can report physical exhaustion with typical daily tasks.

- It can also lead to proprioceptive and balance deficits. Over time and with trauma patients will present with the sequelae of many years of overuse, osteoarthritis, decreased mobility.

- The mainstay of treatment is joint protection techniques, maintenance of periarticular muscle strength which promotes joint stabilization, posture, and appropriate body mechanics are important to reduce pain and avoid injury and early OA which patients are predisposed.

- I recommended that she use compression gloves for her hands as this will improve some of the symptoms related to hypermobility arthralgia. There is also a strong link between hypermobility and autonomic dysfunction as well as fibromyalgia. Autonomic dysfunction can contribute to lightheadedness, dizziness, syncope or exaggerated tachycardia with prolonged standing, upright posture, heat, large meals etc.

> **#Osteonecrosis**
> It is not clear how long she was on high-dose steroids but by the time she saw Dr. Vreede in March 2019 she had extensive infarcts of the knees and ankles. She also had a right hip stress fracture/labral tear. Strongly recommended avoiding steroids in the future unless necessary. We discussed her osteonecrosis. She is seeing Orthopedics at Michigan Medicine. According to her outside records, core decompression was discussed with her in the past but I do not know if she is still a candidate for this. I urged her to follow up with Orthopedics.
>
> **#Fibromyalgia**
> **#Chronic Pain**
> She has reason to have very severe pain with her extensive osteonecrosis. However she also has widespread chronic pain consistent with fibromyalgia we had an extremely lengthy discussion about that. Pathophysiology and treatment were discussed at length. Can consider increasing Gabapentin dose or switching to Lyrica. Recommended she discuss with her Pain physician. Continue with non-pharmacologic and pharmacologic tx strategies.

(Ex. 4 of 11/18/25 Administrative Appeal).

26) Mrs. Robinson provided LF with Prizm Pain Management records. (Ex. 5 of 11/18/25 Administrative Appeal).

27) On 10/14/25, Mrs. Robinson participated in a Functional Capacity Evaluation at Team Rehab in Dearborn Heights, MI. The physical therapist who administered the evaluation concluded as follows:

> Reliability of Pain results obtained during testing indicate pain could have been considered while making functional decisions.

> Client is unable to work full time. The unskilled sedentary occupational base is significantly eroded because she is unable to lift floor to waist 10 lbs or slightly less, shoulder lift 10 lbs or slightly less, power lift 10 lbs or slightly less, bilateral carry 10 lbs or slightly less, stand for 1 hour and 45 minutes, and sit for approximately 6 hours of an 8-hour workday. The client lifted 2.5 pounds to below waist height. The client lifted 1 pounds to shoulder height and 0 pounds overhead. The client carried 2 pounds. Pushing abilities were evaluated and the client pushed 0 horizontal force pounds respectively.
>
> Non-material handling testing indicates the client demonstrates an occasional tolerance for Simple Grasping, Firm Grasping, Pinching, Walking, Above Shoulder Reach, Bending, Dynamic Balance and Stair Climbing. The client demonstrated the ability to perform Forward Reaching with frequent tolerance. The functional activities this client should avoid within a competitive work environment include Squatting, Sustained Kneeling, Repetitive Kneeling, Crawling, Static Balance and Ladder/Other.
>
> During objective functional testing, client demonstrated consistent effort throughout 100.0% of this test which would suggest client put forth full and consistent biomechanical and evidence based effort during this evaluation.

(Ex. 6 of 11/18/25 Administrative Appeal).

28) After reviewing Mrs. Robinson's Functional Capacity Evaluation, Dr. Juratli offered the following opinions:

> **11/5/25**
> Our patient, Eboni Robinson, is an established patient under our care for more than 10 years. I know her well. Mrs. Robinson has SLE and osteonecrosis of her hips. This causes

> significant limitation in her mobility and her ability to fully or independently take care of herself. In my observation, she is unable to engage in repetitive climbing, squatting, stooping, lifting, carrying, pushing, or kneeling. In my best judgement her ability to sit for a prolonged period to achieve meaningful, gainful employment is also limited. Patient has depended on her husband to help with providing for herself and their home.

(Ex. 7 of 11/18/25 Administrative Appeal).

29) As part of LF's appeal review, it directed Mrs. Robinson's information to Roger Belocurt, M.D. (occupational-preventative medicine) to conduct a peer review. On 12/16/25, Dr. Belcourt opined as follows:

> Following review of the available medical documentation, along with the treating provider's recommendation(s) for activity restrictions, there was sufficient information available to form an opinion as detailed below, and there was **no need to consult the treating provider for clarification**.
>
> The claimant is a 43-year-old [sic] female with a medical history significant for Systemic lupus erythematosus, bilateral hip osteonecrosis, CRPS, and thrombocytopenia . . .
>
> As such, restrictions and limitations (R/Ls) are medically supported for low back pain and right hip pain.
>
> **Sitting: Constantly**
> **Standing: Frequently**
> Walking: Occasionally
> Lifting: Occasionally, up to 20lbs, BUE
> Carrying: Occasionally, up to 20lbs, BUE
> Pulling: Occasionally, up to 20lbs, BUE
> Pushing: Occasionally, up to 20lbs, BUE
> Climbing stairs: Occasionally
> Balancing: Occasionally

> Stooping: Occasionally
> Kneeling: Occasionally
> Crouching: Occasionally
> Crawling: Occasionally
> Reaching: Occasionally overhead and below waist levels, unrestricted to desk level, BUE
> Use lower extremities for foot controls: Occasionally RLE, Unrestricted LLE
> Fine manipulation: Unrestricted BUE
> Simple and firm grasping: Unrestricted BUE
>
> No climbing ladders
> No working at unprotected heights
> No operating or being around heavy machinery
> Operating motor vehicles: Occasionally . . .

The claimant's abilities are sustainable on a full-time basis from 05/07/2025 to present.

The claimant can function in a work setting for 8 hours per day, up to 40 hours per week.

The claimant's pain complaints are multi-site and affect her low back, neck, left shoulder, and right hip. She describes the pain using multiple qualities: aching, dull, sharp, shooting, spasmodic, stabbing, tender, and with pins and needles, indicating both nociceptive and neuropathic components. Physical examinations repeatedly demonstrate restricted spinal and hip range of motion, deconditioned musculature, and difficulty with ambulation, confirming that her pain is not only subjective but also objectively associated with functional impairment . . .

**4. Do medical records support any R&Ls that were recommended by treating providers for the timeframes in question?**

**[A]. Yes, medical records support R&Ls that were recommended by the treating providers for the timeframes in question**.

On 11/05/2025, Sham Maghout-Juralli, MD noted that she had SLE and osteonecrosis of her hips, which caused significant limitations in her mobility and her ability to fully and independently take care of herself. The provider observed that she was unable to engage in repetitive climbing, squatting, stooping, lifting, carrying, pushing, or kneeling. In their best judgment, her ability to sit for a prolonged period to achieve meaningful gainful employment was also limited. It was further noted that she was dependent on her husband for assistance with her personal care and household tasks . . .

**Additional Questions**

**7. Please discuss the restrictions or limitations placed upon the claimants' physical activities by the attending physician(s) and the Functional Capacity Evaluation; are they reasonable and consistent with the medical findings? If your findings are different, please explain.**

**[A].** 10/14/2025, Maria Bargardi, PT, DPT/ Physical Therapy: Functional Capacity Evaluation: A baseline Functional Capacity Evaluation was completed to determine the claimant's tolerance to perform work tasks. It was noted that the claimant was unable to work full-time. The unskilled sedentary occupational base was significantly eroded because she was unable to lift floor-to-waist 10 lbs or slightly less, perform a shoulder lift of 10 lbs or slightly less, complete a power lift of 10 lbs or slightly less, or perform a bilateral carry of 10 lbs or slightly less. She was able to stand for 1 hour and 45 minutes and sit

> for approximately 6 hours of an 8-hour workday. The claimant lifted 2.5 lbs to below waist height, lifted 1 lb to shoulder height, and lifted 0 lbs overhead. She carried 2 lbs. Pushing abilities were evaluated, and the claimant pushed 0 lbs of horizontal force. Non-material handling testing indicated the claimant demonstrated occasional tolerance for simple grasping, firm grasping, pinching, walking, above-shoulder reaching, bending, dynamic balance, and stair climbing. She demonstrated the ability to perform forward reaching with frequent tolerance. Functional activities the claimant should avoid in a competitive work environment include squatting, sustained kneeling, repetitive kneeling, crawling, static balance, and ladder/other climbing. **The restrictions or limitations placed upon the claimant's physical activities by the attending physician(s) and the Functional Capacity Evaluation are reasonable but excessive** in 'The claimant lifted 2.5 lbs to below waist height, lifted 1 lb to shoulder height, and lifted 0 lbs overhead. She carried 2 lbs. Pushing abilities were evaluated, and the claimant pushed 0 lbs of horizontal force.'

(Claim File). (emphasis added).

30) LF contacted Dr. Belcourt to request that he clarify his opinions, which he did on 12/29/25 as follows:

> **1) You outline restrictions and limitations under question #3 and indicate the claimant can function on a full-time basis.**
>
> **[A].** Yes, the claimant has reliable and sustainable capacity. Given she ambulates independently with only mild difficulty and retains functional range of motion despite limitations. Although pain, tenderness, and

deconditioning are present, these findings indicate reduced tolerance rather than an inability to perform consistent, modified activities on a sustained basis.

2) **Under question #4 you indicate R&Ls recommended by the treating providers are supported. Per Dr. Maghout-Juralli** [sic]**, this provider opines that the employee's ability to be gainfully employed is limited.**

**[A]. No, medical records do not support R&Ls that were recommended by the treating providers for the timeframes in question**.

3) **Under question #7 you indicate restrictions and limitations placed by attending physician and FCE are reasonable but excessive but do not provide a rationale for your clinical opinion.**

**[A].** The objective findings show pain, limited range of motion, deconditioning, and mild difficulty ambulating, but they do not demonstrate severe weakness, neurological deficit, or inability to perform basic functional tasks. These findings support functional restrictions, not the extreme lifting, pushing, and sedentary work limitations outlined in the Functional Capacity Evaluation.

4) **Clarification is needed. In your report, you outline restrictions and indicate the employee has reliable sustainable capacity. Based on your response under question #4 and 7 you also agree with restrictions and limitations from the attending physician and FCE that are clearly more restrictive and seem to preclude full time capacity.**

**We need clarification along with a clinical rationale as to what restrictions and limitations are supported by**

> **the medical evidence and whether the employee has reliable and sustainable capacity.**
>
> **[A].** The objective findings show pain, limited range of motion, deconditioning, and mild difficulty ambulating, but they do not demonstrate severe weakness, neurological deficit, or inability to perform basic functional tasks. These findings support functional restrictions, not the extreme lifting, pushing, and sedentary work limitations outlined in the Functional Capacity Evaluation.

(Claim File).

31) LF also commissioned an updated 1/8/26 Transferrable Skills Analysis based on Dr. Belcourt's fluctuating opinions.

32) Via 1/9/26 written correspondence, LF provided the Undersigned with copies of Dr. Belcourt's reports and the updated Transferrable Skills Analysis and allowed Mrs. Robinson until 1/30/26 to respond.

33) Given the breadth and quality of objective medical evidence supporting total and permanent disability under the Policy, including imaging studies, radiology studies, labs, treatment notes, medical opinions, and a Functional Capacity Evaluation, and given Dr. Belcourt's favorable and then non-favorable opinions as well as his refusal to contact Mrs.

Robinson's providers or the physical therapist who conducted the Functional Capacity Evaluation, Mrs. Robinson had nothing further to add.

34) On 2/4/26, LF issued its final denial.

35) LF's actions have now foreclosed all avenues of administrative appeal and this matter is ripe for judicial review.

36) Valid, objective, and well-supported medical evidence establishes that Mrs. Robinson is, and shall remain, totally and permanently disabled per the Policy. She is entitled to LTD benefits retroactive to 5/8/25 through the Policy's maximum benefit period, believed to be 7/24/50, as well as a total disability life premium waiver.

**WHEREFORE**, based upon the preceding reasons, Mrs. Robinson prays for the following relief:

A) That this Court enter judgment in Mrs. Robinson's favor against LF and order the immediate payment of disability income benefits retroactive to the date that benefits were wrongfully denied, approximately 5/8/25.

B) That this Court to order LF to honor Mrs. Robinson's total disability waiver of life insurance premium.

C) That this Court order LF to pay Mrs. Robinson prejudgment interest pursuant to *Horn v. McQueen*, 353 F. Supp. 2d 785 (2004) and post-

judgment interest in accordance with M.C.L. § 600.6013 and 600.6455.

C) That this Court award attorneys' fees pursuant to 29 U.S.C. § 1132(g).

D) That Mrs. Robinson be awarded any and all other types of relief to which she may be entitled, along with the costs of litigation.

Respectfully submitted:

**FELDHEIM & WILENKIN, P.C.**

By: s/Ilana S. Wilenkin
Ilana S. Wilenkin (P61710)
Plaintiff's attorney
30300 Northwestern Highway, Suite 108
Farmington Hills, MI 48334
(248) 932-3505; fax (248) 932-1734
ilana@lawsmf.com

Dated: February 16, 2026